THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* NORMAN LEVY and JOHN FRATIANNI, Appellants.

Second Department, February 24, 1975.

*James M. LaRossa* (*Alan M. Dershowitz* and *Gerald L. Shargell* of counsel), for Norman Levy, appellant.

*Joseph E. Brill (Henry J. Boitel of counsel), for John Fratianni, appellant.*

*Maurice H. Nadjari, Deputy Attorney-General (Barry M. Fallick, Bennett L. Gershman and Allen G. Swan of counsel), for respondent.*

*Per Curiam.* The defendants appeal from judgments of the Extraordinary Special and Trial Term of the Supreme Court, Kings County, rendered March 20, 1974, convicting them of conspiracy in the fourth degree, tampering with public records in the second degree and obstructing governmental administration, upon a jury verdict, and sentencing them on all the counts to concurrent terms of 90 days' imprisonment. We reverse the judgments, on the law and as a matter of discretion in the interest of justice, and order a new trial.

The defendants, along with one Stanley Israel, were charged in a 23-count indictment with the crimes of conspiracy, forgery, tampering with public records and obstructing governmental administration. The indictment was reduced to five counts at the beginning of the trial and to three counts at the close of the evidence.

Defendant Levy, President of the New York City Tax Commission, defendant Fratianni, a Deputy Commissioner of Purchase of the City of New York, and Stanley Israel, administrative hearing officer of the Parking Violations Bureau, in Brooklyn, were active in the John V. Lindsay Independent Association, a Brooklyn-based political group. It was charged that in November, 1970 they agreed upon a corrupt plan to dispose of parking summonses at reduced rates for the benefit of their friends and political associates. Between November, 1970 and May, 1971 more than a thousand parking summonses were allegedly handled in this manner. However, the defendants were not charged with ticket-fixing, and there was and is no claim that they personally reaped any financial profits from the scheme. Rather, the gravamen of the conspiracy and the substantive charges of which defendants Levy and Fratianni were ultimately convicted (Israel pled guilty at the beginning of the trial) was that they had adopted a *method* for "fixing" parking tickets which called for illegally tampering with public records. This method, according to Israel—who testified for the prosecution—and who concededly devised and insisted upon it, required the making of notations on the daily logs of the hearing examiners to make it appear that the traffic offenders had

appeared before the hearing officer and that the tickets had been disposed of after a hearing when in fact no such hearing had been held. Although Israel himself was authorized to hold hearings, disposition made of the "fixed" traffic tickets was, for the most part, at his direction, entered upon the logs of other examiners.

The trial was unnecessarily protracted, and the jury's attention diverted from the sole issue in the case, by the prosecution's insistence upon establishing a fact not disputed by the defendants, to wit, that they were involved in a "courtesy" scheme for accommodating friends and persons of various degrees of political prominence who had received traffic tickets. Although the court repeatedly pointed out, as it said in one instance, "We are getting into a situation where we are perverting this trial into a ticket financing [*sic* — fixing?] trial" and that the issue "is not whether there was ticket fixing, but whether the crime of forgery and the crime of tampering was committed [and that] the only issue was — is not the heinousness of the basic and *ultimate act*, but, rather, whether public records were used as or misused as a *means* to accomplish an end" (bracketed matter and emphasis supplied), the People persisted in their procedure.

Defendant Levy correctly points out that although the People called 24 witnesses whose testimony took up approximately 1,140 pages of the transcript, only three pages of the transcript deal with any proof tending to establish that he *knew* the method to be used by Israel (tampering with the records) in disposing of the tickets. However, and more important, the totality of errors, only some of which are enumerated below, necessitates reversal of the judgments and ordering a new trial.

(1) The court trial left it as a question of fact for the jury to determine whether the witnesses Hurtig, Manley and Whitman were accomplices. This was error, since the record makes it clear that they were accomplices as a matter of law. In fact, as to witnesses Manley and Whitman, the court stated, although not in the presence of the jury, that they were "accomplices" and that "by their own testimony, they forged at the direction of the defendant Stanley Israel." Nevertheless, he charged the jury that it was for them to determine the accomplice status of those witnesses. As to witness Hurtig, the record makes it amply clear that she was as much involved in the "tampering charges" against Levy and Fratianni as they were. Since the court charged the jury that "corroborative evidence * * * may be found in any of the evidence presented to you, including any of the exhibits", and since it is impossible to know what

evidence the jury found sufficiently credible to corroborate Israel's testimony, who, as the court correctly charged, was an accomplice as a matter of law and whose testimony therefore needed corroboration from an independent source, the judgments must be reversed (*People* v. *Beaudet,* 32 N Y 2d 371; *People* v. *Jenner,* 29 N Y 2d 695; *People* v. *Doyle,* 304 N. Y. 120; *People* v. *Wyler,* 37 A D 2d 375).

(2) A notebook owned by Fratianni was admitted into evidence. It contained the initials " N. L." alongside the names of some persons who allegedly had their tickets taken care of. The People do not contend that the initials are in defendant Levy's handwriting and upon the trial proper they made no effort to ask witness Hurtig, who apparently kept the notebook, whether the initials referred to Levy. No reference was made to the initials during the taking of testimony and it was only in summation that the prosecutor sought to draw the inference that the initials referred to Levy.

(3) In cross-examination of Israel, counsel for the defendants attempted to show that his testimony against them was biased and was brought about by reason of a deal that he had made with the prosecutor. In a case such as this, where concededly there could be no conviction without Israel's testimony, and then only if it were corroborated by an independent source, the defense should have been afforded ample latitude to show bias on his part. Instead, repeated attempts by counsel to ascertain if Israel was testifying as a result of a deal or other arrangement for lenient treatment were met with repeated objections by the prosecution, all of which were sustained by the trial court. Upon this record those rulings deprived the defendants of a substantial right and constituted grave prejudicial error (cf. *Giglio* v. *United States,* 405 U. S. 150; *Davis* v. *Alaska,* 415 U. S. 308; *People* v. *Moore,* 96 App. Div. 56, affd. 181 N. Y. 524).

(4) In his charge on reasonable doubt the Trial Justice used the same " ' in your hearts and conscience ' " phrase that was criticized by the Appellate Division, First Department, in *People* v. *Johnson* (46 A D 2d 123, 127); *People* v. *Bell* (45 A D 2d 362, 364 [concurring opn.]); and *People* v. *Harding* (44 A D 2d 800).

(5) Since the gravamen of the charges against the defendants was *tampering* with public records, the People were required to prove that the defendants had guilty knowledge of the internal procedures of the Parking Violations Bureau which would necessitate tampering with its records by Israel to consummate the " fixing " of the traffic tickets. The trial court therefore should have granted the charge requested by the defendants that the

People were required to show that the defendants knew that tampering with the records was to be indulged in by Israel as part of the ticket-fixing scheme (see *People* v. *Shapiro,* 4 N Y 2d 597). In addition, in that part of the charge in which the court defined the elements of tampering and the definitions of "false entry in " and " falsely alter ", the terms were confused with the words " falsely makes " as defined in the forgery article of the Penal Law (§ 170.00, subd. 4).

We do not advert to other errors committed upon the trial since they will probably not be repeated upon the new trial hereby ordered.

BENJAMIN, J. (concurring in part and dissenting in part). I am in full agreement with the able majority opinion insofar as it marshals the vital errors that were committed in the trial of this case and directs a reversal of the judgments of conviction. I cannot, however, support the determination for a new trial, since, in my opinion, the facts as stated by the majority mandate a reversal and a dismissal of the indictment.

We are once again confronted with what has become a characteristic tangential approach by this Special Prosecutor in dealing with substantive crimes. It is frustrating in considering convictions of public officilas who have betrayed their trust, as obviously as those named in these indictments, to find that the indictment was not for the wrong which was committed, but for some alleged act which they did not in fact do. Nothing could be clearer upon this record than that this ticket-fixing scheme was the epitome of brazen perfidy. It challenges all understanding how public officials could undertake to set up a place of business for the fixing of traffic tickets. It challenges understanding, as well, as to why this Special Prosecutor did not level such a charge in this case.

Not alone was the trial replete with the various errors which the majority have pointed out, but the record is abundantly clear that the appellants had no role to play in the manner in which the administrative hearing officer mishandled these traffic tickets. All that these defendants were concerned with was that Israel fix the tickets. The manner in which he was to do it was left to his own determination. They were not concerned and they gave no directions as to how it was to be done. That he chose to do it by falsifying and altering records was his own personal act of misconduct, or it was done by him under his own personal direction.

Nowhere in this record is there any evidence of any participation by the appellants in the selection of a method for the

accomplishment of the evil designs. At most, it could be said that the method had been communicated to them. Nowhere is it intended that they participate in any plan for any particular program. Rather, the evidence is abundantly clear that they told Israel what they wanted and that they had no concern for the manner with which it was to be accomplished.

In the absence of any proof of a conspiracy to adopt any special method calling for illegal tampering with public records, this indictment must be dismissed.

COHALAN, Acting P. J., BRENNAN, MUNDER and SHAPIRO, JJ., concur in *Per Curiam* opinion; BENJAMIN, J., concurs in the reversal, but otherwise dissents and votes to dismiss the indictment, with an opinion.

Two judgments (one as to each defendant) of the Supreme Court, Kings County, rendered March 20, 1974, reversed, on the law and as a matter of discretion in the interest of justice, and new trial ordered.